### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07 CR 843 |
| | ) | |
| | ) | Judge Joan H. Lefkow |
| v. | ) | |
| | ) | |
| RONDELL FREEMAN, a/k/a Nightfall, | ) | |
| a/k/a Fall, BRIAN WILBOURN, a/k/a Stay | ) | |
| High, a/k/a "3", DANIEL HILL, a/ka Little | ) | |
| Burling, a/k/a Little B, and ADAM SANDERS, | ) | |
| a/k/a Redman, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

On March 26, 2009, following a five-week trial, a jury found defendants Rondell

Freeman, Brian Wilbourn, Daniel Hill, and Adam Sanders ("defendants") guilty of conspiracy to

distribute and possess a controlled substance, namely cocaine, crack cocaine, heroin, and

marijuana, beginning in or around 1998 and continuing until in or around December 2007

(Count 1). (Dkt. #620, #622, #624, #626.) The jury also convicted defendants of various other

drug-related offenses. On August 26, 2009, this court granted defendants a new trial on Count 1,

and on two possession with intent to deliver counts (Count 10 for Wilbourn, and Count 11 for

Wilbourn and Freeman). *United States* v. *Freeman*, No. 07 CR 843, 2009 WL 2748483 (N.D.

Ill. Aug. 26, 2009) ("*Freeman I*"), *aff'd United States* v. *Freeman*, 650 F.3d 673 (7th Cir. 2011)

("*Freeman II*"). Rather than pursue a new trial against defendants on Count 1, the government

chose to proceed to sentencing on the remaining counts of conviction.[1]  The basis for the new

trial on Count 1 was this court's finding that the principal witness for the government testified

falsely as to essential facts necessary for conviction of conspiracy between Freeman and

Wilbourn, under circumstances in which the government knew or should have known, and the

false testimony affected the verdict.  The evidence of conspiracy adduced at trial rises again in

the context of determining the base offense level applicable to each defendant's recommended

sentencing range under the United States Sentencing Guidelines.

      The government now contends that the court may consider evidence introduced at trial in

support of the conspiracy charged in Count 1 when sentencing defendants on their counts of

conviction.  This evidence, argues the government, is admissible as "relevant conduct" under

U.S.S.G. § 1B1.3.  Defendants object on multiple grounds.  To resolve the issue, the court held a

series of evidentiary hearings, one for each defendant.[2]  In the opinion that follows, the court sets

---

[1]  Freeman was convicted of knowingly possessing with intent to distribute mixtures containing heroin in
violation of 21 U.S.C. § 841(a)(1) (Count 3); use of telephone to facilitate a drug trafficking crime in
violation of 21 U.S.C. § 843(b) (Counts 4, 5, 16–18); possession of a firearm by a felon in violation of
18 U.S.C. § 922(g)(1) (Count 6); and possession of a firearm in furtherance of a drug trafficking crime in
violation of 18 U.S.C. § 924(c) (Count 8).  Wilbourn was convicted of knowingly possessing with intent
to distribute mixtures containing heroin in violation of 21 U.S.C. § 841(a)(1) (Count 3); use of a
telephone to facilitate a drug trafficking crime in violation of 21 U.S.C. § 843(b) (Count 4); possession of
a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) (Count 7); and knowingly possessing with
intent to distribute 5 grams or more of mixtures containing a controlled substance in violation of
21 U.S.C. § 841(a)(1) (Counts 12 and 13).  Sanders was convicted of possession with intent to distribute
50 grams or more of cocaine base in the form of crack cocaine in violation of 21 U.S.C. § 841(a)(1)
(Count 32), and use of a telephone to facilitate a drug trafficking crime in violation of 21 U.S.C. §843(b)
(Counts 20, 21, and 30).  Hill was convicted of knowingly and intentionally distributing 5 grams or more
of crack cocaine in violation of 21 U.S.C. § 841(a)(1) (Count 35).

[2]  The court held Wilbourn's evidentiary hearing on September 21, 2012; Hill's evidentiary hearing on
October 3, 2012; Sander's evidentiary hearing on November 16, 2012; and Freeman's evidentiary hearing
(continued...)

forth the nature and extent of the relevant conduct it will consider when sentencing each defendant.

## LEGAL STANDARD

The sentencing guidelines require a defendant's base offense level to reflect the quantity of drugs for which he is accountable. *United States* v. *Zehm*, 217 F.3d 506, 511 (7th Cir. 2000). Section 1B1.3 states that where the guideline specifies more than one base offense level, the base offense level shall be determined on the basis of the defendant's relevant conduct, which includes the following:

> [(a)](1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or wilfully caused by the defendant; and
>
> [(a)(1)](B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> [(a)](2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
>
> [a](3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> [a](4) any other information specified in the applicable guideline.

_____

(...continued)
on December 14, 2012.

3

U.S.S.G. § 1B1.3.[3]  Section 3D1.2(d) requires grouping of multiple counts when, *inter alia*, "the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm."  U.S.S.G. § 3D1.2(d). Section 1B1.3(a)(2) and § 3D1.2(d) "read together, provide that a district court must increase a defendant's base offense level to account for 'relevant conduct,' which includes drugs from any acts that 'were part of the same course of conduct or common scheme or plan' as the convicted offense, regardless of whether the defendant was charged with or convicted of carrying out those acts."  *United States* v. *Duarte*, 950 F.2d 1255, 1263 (7th Cir. 1991); *see United States* v. *Acosta*, 85 F.3d 275, 279 (7th Cir. 1996).  Moreover, as explained by the guidelines commentary, § 1B1.3(a)(2) "merely incorporates by reference the types of offenses set forth in § 3D1.2(d)" and application of this provision "does not require the defendant, in fact, to have been convicted of multiple counts."  U.S.S.G. § 1B1.3(a)(2)*,* Application Note 3; *cf. Stinson* v. *United States*, 508 U.S. 36, 38, 113 S. Ct. 1913, 123 L. Ed. 2d 598 (1993) (guidelines commentary is authoritative) (cited with approval in *Freeman* v. *United States*, 131 S. Ct. 2685, 2692, 180 L. Ed. 2d 519 (2011)).

In demonstrating relevant conduct under § 1B1.3(a)(2), "the government's burden of proof is twofold:  it must first prove by a preponderance of the evidence that the uncharged conduct bore the necessary relation to the offense of conviction, it must then establish the quantity of drugs involved in that conduct, also by a preponderance of the evidence."  *Acosta*,

---

[3]  The court relies on the November 2012 version of the guidelines.  *See United States* v. *Medina*, 695 F.3d 702, 705 (7th Cir. 2012); *United States* v. *Demaree*, 459 F.3d 791, 795 (7th Cir. 2006).

85 F.3d at 279 (internal citation omitted). Under § 1B1.3, uncharged conduct bears the

necessary relation to the offense of conviction if it is part of a common scheme or plan or the

same course of conduct. U.S.S.G. § 1B1.3(a)(2). If this test is met, the court must then

determine (1) the scope of the criminal activity that the defendant agreed to jointly undertake,

and (2) whether the conduct of others was both in furtherance of that activity and reasonably

foreseeable to the defendant. *United States* v. *Stadfeld*, 689 F.3d 705, 713 n.2 (7th Cir. 2012).

The Seventh Circuit reviews the district court's factual findings under § 1B1.3 for clear error.

*United States* v. *Cedano-Rojes*, 999 F.2d 1175, 1179 (7th Cir. 1993).

## BACKGROUND

The factual background of this case was recounted by the Seventh Circuit in *Freeman II*,

650 F.3d at 675–678, and will only be discussed here as necessary to resolve the pending issue.

Throughout this case, the government has maintained that Freeman was the leader of a

conspiracy (the "Freeman drug trafficking organization" or the "Freeman DTO") that controlled

the sale of cocaine, crack cocaine, heroin, and marijuana in and around the now-demolished

Cabrini-Green public housing complex in Chicago, Illinois beginning in or around 1998 and

continuing until in or around December 2007 when the defendants were arrested in connection

with this case. The government argues that the Freeman DTO sold these drugs 24 hours a day, 7

days a week. As such, the government estimates that the conspiracy sold somewhere between

1.176 and 2.25 kilograms of crack cocaine per week and that, over the course of the conspiracy,

it sold 8.4 kilograms or more of cocaine base in the form of crack cocaine, 150 kilograms or

more of cocaine, 30 kilograms or more of heroin,[4] and a measurable quantity of marijuana. (Gov't Version 10/11/11 at 55 n.11.)[5]

The government argues that defendants Wilbourn, Sanders and Hill helped Freeman manage his drug trafficking organization. According to the government, Freeman and Wilbourn used Freeman's condominium at 5740 N. Sheridan Road ("the Sheridan Shores condo") to prepare and package drugs; and Hill, Wilbourn and Sanders supervised drug sales at particular buildings in the Cabrini-Green complex including 714 W. Division Street ("the 714 Division building") and 1230 N. Burling Avenue ("the 1230 Burling building"). The government also argues that defendants Wilbourn, Sanders and Hill operated as sellers, pushing $5 and $10 baggies of crack cocaine, heroin and marijuana on the street.

At trial, Wilbourn and Hill acknowledged that they sold drugs but denied that they worked for Freeman, arguing that each had his own drug business that serviced customers at Cabrini-Green.[6] Testimony at trial also established that Freeman and those working for him frequently sold drugs in baggies with a blue devil logo on them. Drugs in other types of baggies,

---

[4] The jury found the amount of heroin attributable to the conspiracy to be at least 100 grams but fewer than 1,000 grams. (Tr. 3154, 3156, 3158, 3159.)

[5] The government's estimate is based on the 2010 version of the guidelines, which set a base offense level of 38 for 4.5 kilograms or more of cocaine base. *See* Gov't Version 10/11/11 at 55 n.11; U.S.S.G. § 2D1.1(c)(1) (Nov. 2010). The guidelines have since been revised and the 2012 version sets a base offense level of 38 for 8.4 kilograms or more of cocaine base. *See* U.S.S.G. § 2D1.1(c)(1) (Nov. 2012). Based on its estimates, the government maintains that the Freeman DTO easily meets this new, higher threshold.

[6] The government acknowledged as much in the indictment, which states that "[a]t times, other individuals also supplied wholesale quantities of drugs to members of the Freeman DTO." (Dkt. #173 at ¶ 4.)

6

such as orange stripe, lady bug, and ice cream, were also sold at Cabrini-Green. The orange stripe baggies were Wilbourn's brand of choice.

At the evidentiary hearings, the government presented evidence purportedly linking each defendant to the Freeman DTO and argued that each defendant should be accountable under § 1B1.3 for the entire amount of drugs sold by the Freeman DTO during the course of the conspiracy. The government has excluded the testimony of Senecca Williams[7] and the proffer statements of Darnell Williams and Lonnie Mack.[8] The following is a summary of the evidence related to each defendant's count(s) of conviction and his alleged involvement in the Freeman DTO.

## I.   Rondell Freeman

### A.   Counts of Conviction

Freeman was convicted of knowingly possessing with intent to distribute mixtures containing heroin in violation of 21 U.S.C. § 841(a)(1) (Count 3); use of telephone to facilitate a drug trafficking crime in violation of 21 U.S.C. § 843(b) (Counts 4, 5, 16–18); possession of a

---

[7] Per the court's ruling that it would not consider Senecca Williams's trial testimony in determining defendants' relevant conduct, *see* Dkt. # 1102, the government excluded this testimony from its evidentiary submissions.

[8] In its cover letter to the courtesy copies of sentencing exhibits provided to the court, the government states,

> When the Government has referred to information provided by non-testifying cooperators Darnell Williams and Lonnie Mack in its Sentencing Response, it has done so as additional corroboration of the trial witnesses and evidence. Therefore, the Government does not need to rely on the information as substantive evidence in support of the Government's positions at sentencing and suggests that the Court need not do so either in determining disputed Guidelines issues.

(*See* Letters dated 11/14/2012 (Freeman & Sanders); Letter dated 9/19/2012 (Wilbourn); Letter dated 9/24/2012 (Hill).)

firearm by a felon in violation of 18 U.S.C. § 922(g)(1) (Count 6); and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Count 8).  Proof of Counts 3, 4, 5, 6 and 8 rested on audio/video surveillance recordings made on March 25, 2006. Count 3 stems from an incident where Freeman is seen preparing and packaging heroin with Wilbourn at the Sheridan Shores condo.  That same day, Freeman can be heard using the speaker function of his phone to discuss the collection of "envelopes" (drug proceeds) with Wilbourn, the basis of Count 4.  (*See* 3/25/06 Video Tr. 1, Clip 1.)[9]  Later, Freeman is again heard using the speaker function of his phone to discuss with Robert Freeman[10] procuring a gun, the basis of Count 5.  (*See* 3/25/06 Video Tr. 7, Clip 2.)[11]  For Counts 6 and 8, Freeman can be seen receiving a pistol from Robert Freeman at the Sheridan Shores condo.[12]

---

[9]  During their conversation, the following colloquy takes place:

Freeman:    Where Buck [Demarquis Williams] at?
Wilbourn:   I think he at the crib.  I don't know.  You want me to go over there before I go that way?
Freeman:    Call that phone first.  I'm a call him, and tell him to give me whatever envelopes he got to give them to me.

(3/25/06 Video Tr. 1, Clip 1.)

[10]  Robert Freeman pleaded guilty and was sentenced on July 28, 2009.  (Dkt. #726.)

[11]  During their conversation, the following colloquy takes place:

Robert Freeman:    Hey, remember I was just hollering at ya about the shit [guns] you wanted to get?
Rondell Freeman:   Yea.
Robert Freeman:    He got, he got 2 for 7 dollars [two guns for $700].
Rondell Freeman:   What he got?
Robert Freeman:    Like something I gave you, but better.  The one, the one you lost and something a little bit more than that.

(3/25/06 Video Tr. 7, Clip 2.)

[12]  According to the government's version,

Approximately an hour [after Rondell Freeman discusses procuring a gun with Robert

(continued...)

8

Counts 16 through 18 were proved through conversations recorded pursuant to a court-authorized wiretap on Freeman's phone on August 9, 2006. These counts stem from phone discussions between Freeman and alleged co-conspirator Syble McClutchey[13] where the two discuss the seizure of drug money by the police. (*See* Calls #5609, #5611, #5615; Tr. 1235; 1265.)

**B.     Involvement with the Freeman DTO**

At the evidentiary hearing, the government presented a summary of its evidence against Freeman, which included but was not limited to (1) numerous seizures of narcotics, proceeds from drug sales, guns and drug-related evidence from Freeman and other members of the alleged conspiracy; (2) multiple court-authorized audio/video recordings depicting Freeman and others cooking and packaging crack cocaine and heroin, purchasing firearms, collecting and counting drug proceeds, and discussing the distribution of drugs; (3) agent testimony regarding visual surveillance and stops of alleged co-conspirators; (4) recorded phone conversations intercepted pursuant to court-authorized wiretaps and recordings from the Illinois Department of Corrections ("IDOC"); (5) drug ledgers and packaging recovered from 18 trash pulls outside the Sheridan Shores condo; and (6) testimony from alleged co-cooperators Ralph LaSalle and Demarquis Williams concerning the nature and scope of the alleged conspiracy. Given the breadth of the

---

(...continued)
> Freeman] at 8:52 p.m., Robert Freeman returned to the Target Unit and handed Rondell Freeman a pistol. Rondell Freeman asked, "Is it a 9?" Robert Freeman responded, "Yea . . . this is a throwaway [a gun to be used and discarded]. Rondell Freeman . . . then accepted the pistol."

(Gov't Version 10/11/11 at 14.)

[13] Sybile McClutchey pleaded guilty and was sentenced on May 20, 2010. (Dkt. #900.)

evidence presented, the court will not recount it in detail here and instead refers the reader to the government's response at docket number 1089, which succinctly summarizes the evidence presented against Freeman.

Throughout the sentencing process, Freeman has maintained that prosecutorial misconduct and the lack of a retrial barred the court from relying on facts related to the alleged conspiracy in determining his relevant conduct under § 1B1.3. Freeman argues that prosecutorial misconduct is akin to police misconduct, which bars all evidence considered "fruit of the poisonous tree," and as such, his base offense level should be determined solely on the drug quantities contained in his counts of conviction. At the evidentiary hearing, Freeman challenged nearly every piece of the government's evidence arguing that the government's witnesses were unreliable, biased, and/or provided vague, uncorroborated testimony concerning the nature and scope of his drug activities. Freeman also provided alternative, licit explanations for his conversations and actions and highlighted the fact that specific drug amounts, dates and times were difficult, if not impossible, to determine based on the audio/video/phone recordings and the testimony of witnesses. (*See* Dkt. #1158 & #1160.)

## II. Brian Wilbourn

### A. Counts of Conviction

Wilbourn was convicted of knowingly possessing with intent to distribute mixtures containing heroin in violation of 21 U.S.C. § 841(a)(1) (Count 3); use of a telephone to facilitate a drug trafficking crime in violation of 21 U.S.C. § 843(b) (Count 4); possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) (Count 7); and knowingly possessing with intent to distribute 5 grams or more of mixtures containing a controlled substance in violation of

21 U.S.C. § 841(a)(1) (Counts 12 and 13).  Evidence of Counts 3 and 7 was audio/video surveillance (briefly recounted in the facts below).  The evidentiary basis of Count 4 is recounted in Background, Part I.A., *supra*.

Counts 12 and 13 stem from an incident that occurred in the late evening and early morning hours of April 10 and 11, 2006.  The government's evidence showed that law enforcement on April 10, 2006 observed Wilbourn and his girlfriend Raven Ramclam entering the Sheridan Shores condo where Freeman and Wilbourn were known to prepare and package drugs.  (Video 4/10/06.)  Ramclam testified that once the two were inside the condo, Wilbourn poured two powdery substances onto the living room table and mixed them together.  He then used a small spoon to scoop the powder into baggies.  (Tr. 933–36.)  Shortly after midnight on April 11, 2006, Wilbourn and Ramclam left the condo, entered Ramclam's SUV, and drove to Lake Shore Drive where they were pulled over by authorities.  (Video 4/11/06; Tr. 941–42.)  Wilbourn exited the passenger side of the car and attempted to flee.  (Tr. 942–47; 1000.)  In the process, he discarded a clear plastic package, which was recovered by authorities and found to contain 48.3 grams of crack cocaine and 23.4 grams of heroin packed in orange stripe baggies.  (Tr. 1000–03; 2544–45.)

**B.      Involvement with the Freeman DTO**

At the evidentiary hearing, the government presented a chronological narrative of

Wilbourn's alleged involvement in the conspiracy. Some of this evidence is summarized

below:[14]

- 1998 and 1999: Demarquis Williams testified that Freeman and Wilbourn were "on the count" at the 714 Division building, meaning they were "with an organization with a group of people that's running the operation in that building . . . a drug operation." (Tr. 1758–60.) Williams also testified that Wilbourn delivered drugs to him on Freeman's behalf "three or four times," once in late 2005, and that "two time[s]" Williams paid Wilbourn for drugs supplied by Freeman. (Tr. 1796–99; 1838–39.)

- November 16, 2000: Police seize 1 gram of crack cocaine and $691 in cash from Wilbourn after he tries to flush the drugs down the toilet in an apartment at the 714 Division building. (Tr. 1721–24; 1733; 2554.)

- March 11, 2002: Police seize a bag containing 352 baggies labeled with the blue devil logo containing 38.6 grams of crack cocaine, .3 grams of heroin, and 23.8 grams of marijuana after seeing Wilbourn push the bag down the mail slot in the lobby of the 1230 Burling building. (Tr. 1735–40; 1750; 2551–52.)

- October 30, 2003: IDOC records a telephone conversation between Sanders and Wilbourn, who is in custody. Wilbourn urges Sanders to "step up" and take his "slot" while he is in prison and complains about the lack of supervision over drug sales at the 1230 Burling building. (Gov't Ex. IDOC 10/30/03; Tr. 2298–2303.)

- January 13, 2004: IDOC records a telephone conversation between Hill, Sanders, and Wilbourn in which Hill tells Wilbourn that police "kicked in the door on us" but did not find drugs or money. Wilbourn reminds them not to keep narcotics where they live. (Gov't Ex. IDOC 1/13/04.)

- October 8, 2005: ATF agents recover a kilo wrapper and pyrex glass with cocaine residue from a trash pull outside the Sheridan Shores condo after seeing Senecca Williams throw a bag in the dumpster upon exiting the building with Wilbourn and Freeman. (Tr. 541–42; 2548–49.)

- March and April 2006: Wilbourn is captured on audio/video surveillance made from inside the Sheridan Shores condo (1) manufacturing and packaging heroin with

---

[14] The remaining evidence can be found in the government's response at docket number 1087.

Freeman;[15] (2) paying Freeman $1,000 in cash and requesting that Freeman front him drugs, which Freeman declines to do;[16] (3) handling a gun purchased by Freeman;[17] and (4) cooking and packaging crack cocaine with Freeman and others. (Tr. 757–58; 815–20; 824–33; 857; Videos 3/25/06, 3/29/06; 4/1/06.)[18]

- May 3, 2006: Wilbourn and Freeman are seen exiting the Sheridan Shores condo and Wilbourn throws a trash bag into the dumpster. This bag is found to contain clear plastic bags with cocaine residue, latex gloves, and a drug ledger. (Tr. 575–78; 2544.)

- October 22, 2006 through November 1, 2006: The government records multiple telephone conversations between Freeman and Wilbourn, and later Freeman, Sanders, and Wilbourn, pursuant to a court-authorized wiretap. These phone conversations are summarized in the government's response to Wilbourn's sentencing memorandum and will not be recounted here. (*See* Dkt. #1087 at 4–6.) In these calls, Wilbourn can be

---

[15] Count 3 is based on video surveillance evidence from March 25, 2006 where Wilbourn is seen packaging heroin into small baggies at the Sheridan Shores condo. (*See* Video 3/25/2006.) As explained in the government's version of events,

> At approximately 1:13 p.m., Brian Wilbourn arrived at the Target Unit and joined Freeman. Wilbourn then walked towards the kitchen, and the sound of blender running could next be heard. At approximately 1:37 p.m. Wilbourn re-entered the living room wearing latex gloves, placed a plate on the coffee table, and sat near Freeman. Wilbourn then used an object that resembled a straw to gather a substance on the plate resembling heroin and place it into small objects that appeared to be ziplock baggies. . . . At approximately 6:07 p.m., . . . Wilbourn began wrapping a plastic baggie in cellophane. . . . At approximately 6:24 p.m., Wilbourn . . . picked up the plastic baggie he had just wrapped in cellophane, and placed it into his coat pocket. At approximately 6:27 p.m., Wilbourn left the Target Complex and entered into the passenger-side of a waiting car, which then departed.

(Gov't Version 10/11/11 at 11–13.) Agent Edward Piacenza testified that if Wilbourn had packaged five capsules of heroin per minute during this time that he would have packaged around 300 capsules in one hour. (Tr. 815–20.)

[16] When Wilbourn asks Freeman to front him drugs Freeman responds, "C.O.D. [cash on delivery], G . . . I can't do it. I ain't finna lose out. You still owe, man. You need to get right." (3/25/06 Video Tr. 6 Clip 4 & 5.) The government argues that Freeman would not front Wilbourn the drugs because Wilbourn still owed Freeman money for previously-fronted narcotics.

[17] Count 7 is based on videotape evidence from March 25, 2006 where Wilbourn is seen posing with a gun belonging to Freeman in the Sheridan Shores condo. (*See* Video 3/25/2006 & Video Tr. 7 Clip 8.)

[18] This evidence shows that on March 29, 2006, Wilbourn attempted to cook crack cocaine in the kitchen of the Sheridan Shores condo but instead burned the batch. On April 1, 2006, Freeman instructs Wilbourn on how to properly cook crack cocaine. (*See* Videos 3/25/06 & 4/1/06.)

heard discussing the collection of money, the manufacture and distribution of drugs, the rate of drug sales at the 1230 Burling building and police presence in the area.[19]

• November 13, 2006: Police seize 77.6 grams of crack cocaine from Sanders packaged in blue devil and orange stripe baggies after observing Sanders lean into a car registered to Wilbourn's mother, containing three males, one of whom resembled Wilbourn. This interaction occurred shortly after Wilbourn left the Sheridan Shores condo. (*See* Background, Part III.A., *infra*.)

• May 24, 2007: Agents execute a search warrant at the Sheridan Shores condo and seize, among other items, plastic baggies with the blue devil and orange stripe logos on them. (Tr. 783; 792–93; 899.)

Wilbourn challenges the government's evidence point by point[20] arguing that, although he was friends with Freeman, he operated his own independent drug business and was not a member of the Freeman DTO. Wilbourn admits using the Sheridan Shores condo to prepare and package drugs but argues that he dealt his own brand of drugs, orange stripe, and did not work for Freeman. Wilbourn also argues that (1) Demarquis Williams provided conflicting testimony regarding the scope of Wilbourn's involvement in the conspiracy; (2) the surveillance evidence demonstrates that Wilbourn operated independently of Freeman; and (3) Wilbourn and Freeman worked together in a number of business ventures unrelated to drugs, which explains their frequent interactions.

Wilbourn first argues that Demarquis Williams provided conflicting testimony at trial. For example, Demarquis testified that, as far as he knew, Wilbourn was not Freeman's drug deliveryman, did not work for Freeman, and was allowed to sell drugs in the 1230 Burling

---

[19] Wilbourn attempts to explain these conversations by arguing that he was working with Freeman at a nightclub at the time these calls were recorded.

[20] For brevity, the court will not recite all of Wilbourn's objections but notes that in general he argued that the government's evidence was vague and failed to adequately link him to the conspiracy. He also provided non-drug-related explanations for his actions. (*See* Dkt. #1030, #1101, #1133.)

14

building because he was friends with Freeman. (Tr. 1841, 1843–44.) Williams testified that when he was working for Freeman, he would not check in with Wilbourn, and that he saw Wilbourn deliver drugs to Sanders, who sold them and returned the proceeds to Wilbourn, not Freeman. (Tr. 1842.) This testimony supports Wilbourn's position that he operated an independent drug business.

Wilbourn next argues that the surveillance videos never showed him preparing, packaging, or selling Freeman's drugs and that the one time he attempted to buy drugs from Freeman he was rebuffed. This fact, argues Wilbourn, demonstrates that he and Freeman had a classic "buyer-seller relationship" and that he was not a member of the conspiracy. (*See* Tr. 825; 830–31.) Wilbourn also notes that his name did not appear on any of the drug ledgers recovered by authorities. (*See* Tr. 671–72; 1668.)[21]

As to his third point, Wilbourn argues that a number of legitimate business ventures explain his close ties to Freeman. Ramclam, for example, testified that Wilbourn and Freeman organized events every Friday and Saturday night at the Kompel Club at 51st and Prairie in Chicago. (Tr. 963–64.) Demarquis Williams also testified to this fact. (Tr. 1844–45.) In addition, Ramclam testified that Wilbourn worked at the Lick City Car Wash at 87th and Loomis just about everyday from the spring of 2006 through the end of 2006. Freeman owned this car wash. (Tr. 964–66.)[22] Finally, Wilbourn states that he was incarcerated from April 23, 2002

---

[21] Wilbourn argues that he was not involved in collecting drug debts for Freeman (*see* Tr. 827), but the government's evidence indicates otherwise. (*See* Calls 5549, 5562, 5659, 7517.)

[22] Wilbourn also argues that he helped manage an apartment building owned by Freeman where Wilbourn's godmother lived. The cited testimony, however, does not support this conclusion. (*See* Tr. 1846 (Demarquis Williams testifies that Wilbourn "did work" at his godmother's building a "[c]ouple

(continued...)

through September 8, 2005 and was not involved in the drug trade during this time. (Tr. 2509–10.) Given this evidence, asserts Wilbourn, he is only accountable for the drug amount recovered in his counts of conviction and not those amounts attributable to the conspiracy under § 1B1.3.

## III. Adam Sanders

### A. Counts of Conviction

Sanders was convicted of possession with intent to distribute 50 grams or more of cocaine base in the form of crack cocaine in violation of 21 U.S.C. § 841(a)(1) (Count 32) and use of a telephone to facilitate a drug trafficking crime in violation of 21 U.S.C. §843(b) (Counts 20, 21, and 30). The circumstances of Counts 20, 21 and 30 are summarized in the footnote below.[23] As to Count 32, the circumstances are as follows. On November 13, 2006, agents

---

(...continued)

times a week," but does not state that Wilbourn was responsible for managing the building.).)

[23] Count 20: On October 23, 2006 at approximately 5:03 p.m., Freeman asks Sanders about money that Sanders received from Bob (Reginald Booker) and Duke (Deshawn Simmons). Freeman tells Sanders, "So I got to give Stay High [Wilbourn] that money out of there, that five hundred out of there, for them caps [capsules of narcotics]." Sanders responds, "Right. And Stay High . . . got to give . . . me a hundred dollars out of that five hundred . . . Tell him that . . . hundred dollars goes, it makes it forty-four ($4400)." (Call 5659.)

Count 21: On October 24, 2006 at approximately 12:36 a.m., Sanders and Freeman discuss who is allowed to sell drugs in the 1230 Burling building. Sanders tells Freeman, "… [Rickdog] asked me, 'So the end can come in here and serve [sellers from outside the building are allowed to deal drugs inside the building] . . . it's all good for them . . . [to] do their thing?'" Freeman responds, "They bitches. I can't wait and beat this case. . . . I'm come hold down . . . the shorties . . . up there. . . . Those niggas cowards . . . . Everybody do what the fuck they want, man." Later Sanders says, "They say we gonna talk to them calm, right. Talk to the nigga who not supposed to be in here . . . tell them . . . there ain't no more of that . . . . Man, I say that shit is over with. It's too late. You all let them in. Now, we got to be aggressive. Now we got to slap the shit out of one of them . . . ." Freeman replies, ". . . them bitch-ass niggas don't want no trouble . . . That's what a motherfucker got to do, beat a nigga's ass, your own guys . . . Mistreat them . . ." Sanders states, "When Bob [Reginald Booker] get up there everybody move out the way.

(continued...)

surveilling the Sheridan Shores condo observed a Dodge Intrepid registered to Wilbourn's mother parked in the spot assigned to Freeman. At approximately 8:40 p.m. three black males, one of whom resembled Wilbourn, walked from the complex door and got into the Intrepid. (Tr. 2126–28.) Agents followed the Intrepid to a gas station at Clark and LaSalle Streets in Chicago where it parked parallel to a maroon Buick sedan registered to Syble McClutchey. Sanders exited the Buick, walked to the front passenger side window of the Intrepid and leaned into the window well area for 10 to 15 seconds. Sanders returned to the backseat of the Buick and began making pushing motions to the lower area of the passenger side seat. The Buick then pulled away and began heading in the direction of the Cabrini-Green housing complex. (Tr. 2170–78.) Chicago police officers stopped the Buick two blocks away from the 1230 Burling building. When officers approached the car, Sanders was sitting in the back seat. The officers asked Sanders to exit the vehicle. They then recovered a black bag from underneath the front passenger seat. (Tr. 2201–04.) This bag contained 404 blue devil baggies, 120 orange stripe baggies, and another bag containing an off-white solid. Inside these baggies police discovered crack cocaine, which was later determined to weigh a total of 77.6 grams. (Tr. 2542.)

---

(...continued)

When he leaves, you all do what you all want to do, man." Freeman states, "That's why I want you to be watching them shorties. Make sure they ass don't go nowhere. And, you stay your ass out there." (Call 5700).

Count 30: On October 29, 2009 at approximately 11:39 a.m., Sanders and Freeman discuss drug sales. Freeman asks, "Hey, what's up with [Reginald Booker]. . . ?" Sanders responds, ". . . he say he still . . . holding." Freeman states, ". . . tell him to put it out there." Sanders responds, "That's what I told him. . . . He going to put like forty." (Call 6933.)

### B.      Involvement with the Freeman DTO

At the evidentiary hearing, the government presented a chronological narrative of

Sanders's alleged involvement in the conspiracy, including:

- 2000 or 2001 or 2002 to 2005:  Demarquis Williams testified that he saw Sanders selling drugs in the 1230 Burling building starting in 2000, 2001, or 2002 and continuing through 2005. (Tr. 1810; 1912–13.)  He saw Sanders selling crack cocaine, marijuana, and heroin in the building a "[c]ouple of days out of the week."  (Tr. 1810.)  When he saw Sanders selling crack cocaine or heroin, it was packaged in blue devil or orange stripe baggies.  (Tr. 1811.)  When he saw Sanders selling marijuana, it was packaged in blue devil baggies.  (*Id.*)  Williams also testified that he saw Sanders and Freeman meet to exchange money three or four times a month.  (Tr. 1811–12.)  Williams stated that when he first started selling drugs for Freeman in 2004, that Sanders was the person who delivered the drugs, although Williams declined to disclose this fact to agents when he was initially interviewed.  (Tr. 1768–70; 1898–1902; 1950.)

- October 30, 2003:  IDOC records a telephone conversation between Sanders and Wilbourn, who is in custody.  Wilbourn urges Sanders to "step up" and take his "slot" while he is in prison because Sanders "just let the slot just be open."  Sanders responds that "it just more cases," meaning that he would just be arrested and face further charges.  Wilbourn criticizes Sanders for his "lay back" attitude and tells him to "[g]o back home with mama."  (Gov't Ex. IDOC 10/30/03.)

- November 28, 2005:  Sanders and Demarquis Williams are arrested by Chicago police officers after attempting to flee the 1230 Burling building.  Police recover 99 capsules of heroin weighing 19.4 grams.  (Tr. 2063-2100.)

- January 30, 2006:  IDOC records a telephone conversation between Sanders and a female.  The female asks if Sanders wants her to send him money for his birthday and he tells her that he would rather she "[g]et a crib"(an apartment).  When the woman states that she might not be able to get the money together, Sanders responds that he would "have to do what I gotta do . . . (Laughs) Blue Devs."  (Gov't Ex. IDOC 1/30/06.)

- October 20, 2006 through October 28, 2006:  The government records multiple telephone conversations between Freeman and Sanders pursuant to a court-authorized wiretap. These phone calls include Counts 20, 21 and 30 and a number of conversations that are briefly summarized in the footnote.[24]

---

[24]  These conversations include the following truncated discussions:

(continued...)

- January 24, 2007:  Sanders is arrested at the 1230 Burling building and police seize 6 small bags of heroin and 155 bags of crack cocaine containing blue devil, red dice and other baggies of different colors and designs.

Sanders challenges the government's evidence on a number of grounds.  First, Sanders argues that he should not be held accountable for 30 kilograms of heroin, the amount advocated by the government under § 1B1.3, because the jury only found him accountable for at least 100 grams but fewer than 1,000 grams of heroin, and because he was arrested on numerous occasions and only once was he convicted of possessing heroin.  (Tr. 3159.)  Second, Sanders argues that he should not be held accountable for 8.4 kilograms of crack cocaine because (1) Demarquis Williams's testimony is unreliable and the recorded phone conversations do not establish liability for that amount;[25] (2) Sanders was not a high-level manager, but rather a common

_____

(...continued)

- Freeman asks Sanders, "[W]hat that money was that you gave me?  How much money was that you gave me?"  Sanders responds, "11-50 . . . [i]t's right?"  (Call 5502.)

- Freeman tells Sanders "How was you going to run the envelopes and your asleep now . . . . Come on, man, this is serious."  (Call 5503.)

- Freeman tells Sanders, "New City is still the boss . . . Tell them shortys [to be] on point in the morning."  Sanders answers, "Bob's squad?"  Freeman says, "Nah, them other shortys."  Freeman later says, "You need to get my money from Little B [Hill] in the morning. . . .  you gave Little B that two hundred?" Sanders answers, "Yea."  (Call 6226.)

- Freeman tells Sanders, "I should have made motherfuckers wait two more days.  I need money too . . . where the rest of it at? . . .  He only gave three hundred?" Sanders says, "He gave ole girl fifty."  Freeman says, "You gave Little B two-fifty?"  (Call 6287.)

- Freeman asks Sanders, "Hey, you ever holler at Duke?"  Sanders responds, "Yea. Man, that bitch only gave me four hundred dollars, three fifty."  Freeman later says, "I'm a make some 57 [heroin], man."  Sanders responds, "Come get me."  (Call 6705.)

[25] Sanders also challenges the reliability of the out-of-court statements of Reginald Booker, but given the court's ruling, *see* Analysis, Part III.C., *infra*, it declines to reach the issue at this point.

delivery boy and seller whom Freeman distrusted; and (3) the government misapplies § 1B1.3 to the facts of this case.[26]

As to his first point, Sanders argues that Williams could not provide specific dates and details concerning his alleged drug sales; rather, the only time Williams clearly testified concerning Sanders's involvement in the Freeman DTO was when Williams stated that the first time he sold drugs for Freeman, Sanders had been the one who delivered the drugs. (Tr. 1769.)[27]

---

[26] Sanders argues that he should not be held accountable for 150 kilograms of cocaine, which the government concedes in its response. (*See* Dkt. #1086, Gov't Resp. at 5–6 n.3.) The court will not consider this amount when calculating Sanders's base offense level under § 1B1.3.

[27] For example, Sanders points to Williams's testimony on cross-examination where the following colloquy took place:

Q:     Do you remember like when you would have seen [Sanders] selling in 2002 if it were that year?
A:     Well, like summer, winter, like that, is that what you saying?
Q:     Yes, if you know when it was that you saw him.
A:     Part of during the spring.
Q:     You saw him selling in the spring of 2002?
A:     During one of them years, 2000 or 2001 or two.
Q:     Okay. Did you also see him then selling after that?
A:     Yes.
Q:     Did you see him selling in 2005?
A:     If he weren't locked up, yes, I did.
Q:     You did see him selling in 2005?
A:     If he wasn't locked up, I did; yes.
Q:     Okay. When did you see him selling in 2005?
A:     If he wasn't locked up, I saw him.
Q:     You saw him. I know you've said that. But when, I'm asking you when did you see him selling in 2005?
A:     I don't remember because he was locked up during half of the time so I can't really tell you that.
Q:     But you do remember when in 2005 you saw him?
A:     No.
Q:     You don't remember?
A:     It was during them years he be locked—he's been constantly getting locked up so I can't sit up here and tell you what—like if it was winter or the summer. I can't tell you that.
Q:     So you don't know. So you're testifying for all these years but you don't really have any specific recollection as to when it was during the years; is that right?
A:     Yeah.

(continued...)

20

In addition, Sanders argues that the wiretap conversations, which occurred over an eight day period in 2006, fall short of demonstrating his prolonged and regular involvement with the Freeman DTO.

As to his second point, Sanders argues that he was not a manager but rather an inept seller and messenger who was prone to getting caught. At trial, Demarquis Williams testified that Freeman considered Sanders to be "a fuck-up" and that Freeman did not trust Sanders. (Tr. 1904.) Sanders argues that the phone evidence demonstrates that Freeman and those associated with him criticized Sanders for declining to assume a leadership role in the conspiracy and for failing to take responsibility for distributing drugs and collecting payments. These conversations, argues Sanders, demonstrate that he did not agree to jointly undertake the full scope of criminal activity perpetrated by the Freeman DTO. Additionally, Sanders presented evidence that he was incarcerated for large portions of 2002, 2003, 2005, 2006 and 2007, and argues that he did not actively participate in the conspiracy during those times.[28]

Finally, as to his third point, Sanders argues that the government has failed to prove that he agreed to undertake the full scope of the conspiracy and that the distribution of 8.4 kilograms of crack cocaine was reasonably foreseeable to him. At the same time, Sanders concedes that some of his prior drug activity is relevant to determining his base offense level under § 1B1.3. This prior activity includes arrests and convictions for offenses that occurred on the following

---

(...continued)
(Tr. 1912–13.)

[28] Sanders was incarcerated from February 8, 2002 through October 10, 2002; February 5, 2003 through February 27, 2003; April 28, 2003 through September 22, 2003; January 13, 2005 through August 3, 2005; November 29, 2005 through October 6, 2006; and January 25, 2007 through August 31, 2007. (Dkt. #1007 at 8–9.)

dates: June 29, 2001 (5.1 grams of crack cocaine, 30 grams of marijuana); January 11, 2005 (6.2 grams of cocaine base);[29] November 28, 2005 (19.4 grams of heroin); November 13, 2006 (77.6 grams of crack cocaine, Count 32); and January 24, 2007 (8.4 grams of crack cocaine). Thus, the total drug amount for which Sanders admits liability is 19.4 grams of heroin, 97.3 grams of crack cocaine, and 30 grams of marijuana. (*See* Dkt. #1147; Sanders's Am. Reply at 10–12.)

IV. **Daniel Hill**

A. **Count of Conviction**

Hill was convicted of knowingly and intentionally distributing 5 grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1) (Count 35). As to this count, evidence presented at trial established that informant Lonnie Mack met with Hill in a black Monte Carlo on July 2, 2007 in a parking lot just east of the 1230 Burling building. Mack asked Hill how much a half-ounce of crack cocaine was and Hill responded $350. (Tr. 7/2/07 at 1 of 2.)[30] Hill said he could have the drugs for Mack that night or the next morning. (*Id.* at 2 of 2.) The next day, July 3, 2007, Mack met with Hill in the same car and parking lot and gave Hill $350. Hill exited the car, spoke with individuals in the parking lot and used his cell phone. Three hours later, Hill again met with Mack and gave him a clear plastic baggie containing 12.3 grams of crack cocaine. (Tr. 1991–2037; 2536–37.) On cross-examination, Agent Joseph Delicio, one of the agents operating surveillance, testified that he did not know who gave Hill the drugs that Hill

---

[29] These first two offenses are recounted in Sanders's presentence investigation report. (*See* Supp. PSR at 8 & 12.)

[30] This transcript, as with other evidence presented at the hearings by the government, was provided to the court upon its request and is not located on the docket.

sold to Mack or where Hill got the drugs from.  (Tr. 2017–19.)  He also stated that Freeman was

incarcerated at the time of the sale.  (Tr. 2018.)

### B.    Involvement with the Freeman DTO

At the evidentiary hearing, the government presented a chronological account of Hill's

alleged involvement in the conspiracy, including:

- 2000 to 2001:  Demarquis Williams testified that he saw Hill selling marijuana packaged in blue devil baggies in the Cabrini-Green area in 2000 and 2001.  (Tr. 1812–13.)

- Sometime in 2000 through 2006:  Ralph LaSalle testified that Freeman sent Hill "a couple of times" to purchase drugs from LaSalle on Freeman's behalf, although LaSalle never gave the drugs directly to Hill.  (Tr. 1062; 1096–97.)[31]  LaSalle also testified that Freeman typically purchased between one and two-and-a-half kilograms of cocaine at each transaction.  (Tr. 1045, 1055–57, 1124–25.)

- 2004:  Demarquis Williams testified that he saw Hill selling marijuana, crack cocaine, and heroin in 2004.  The crack cocaine and heroin were packaged in clear baggies with an ice cream cone on them.  (Tr. 1813–14.)

- January 13, 2004:  IDOC records a telephone conversation between Hill and Wilbourn, who was in custody.  Hill tells Wilbourn that the police kicked in the door of an apartment, but that they only recovered money not drugs.  (Gov't Ex. IDOC 1/13/04.)

- Sometime after 2004:  Demarquis Williams testified that he and Hill learned that an individual named Trap was selling drugs at the 1230 Burling building without Freeman's permission.  At Freeman's direction, the two men ordered Trap out of the building and Hill fought Trap to remove him.  (Tr. 1814–22.)

- December 19, 2005:  Police seize gray baggies containing crack cocaine from Hill in the 1230 Burling building.  (Tr. 1966–74.)

- March 25, 2006:  Audio/video surveillance demonstrates that Hill was present at the Sheridan Shores condo when Rondell Freeman discussed purchasing a firearm with Robert Freeman and that Rondell Freeman asked Hill for money to purchase the gun to

---

[31]  The government states that it is unclear whether LaSalle meant that he did not hand Hill the drugs because Freeman would pick them up later, or because LaSalle, as was his practice, would give the drugs to David McClinton, a middle man, who would then give them to Freeman.

which Hill responded, "You should have told me that yesterday." (*See* Video Tr. 3/25/06 at 51–52.)

• April 1, 2006: Audio/video surveillance captures Hill and Wilbourn discussing charging unauthorized dealers money to sell drugs in the 1230 Burling building. Wilbourn says to Hill, "You know anybody that gets caught on the 1st floor again, that's fifty bucks." Hill responds, "Next time somebody gives somebody some crack that don't belong in the building that's fifty dollars (laughing). . . . I don't say shit to nobody, nigga. Because it be everybody's shit." (Video Tr. 4/1/06 at 16–17.)

• October 8, 2006: A drug ledger recovered during a trash pull is found to contain the initials "L.B." accompanied by some arithmetic. (Tr. 1428.) Hill's nickname is "Little Burling" or "Little B." (*See* Dkt. #173.)

• October 25, 2006 through November 3, 2006: The government records multiple telephone conversations between Hill, Freeman, Wilbourn, and Booker pursuant to a court-ordered wiretap. These phone calls include the following conversations:

  • Hill explains to Freeman that he just got pulled over by the police and that they were searching his car. Freeman responds, "You cool though right?" Hill responds, "I don't know we'll see." (Call 5952.)[32]

  • Freeman asks Hill to bring "that money" to him; Hill responds that Wilbourn is at "the [1230 Burling] building" and he will get the money and bring it to Freeman. (Call 6399.)

  • Hill tells Booker that the police are parked in back of the 1230 Burling building. (Call 5424.)

  • Booker tells Hill that the police were at co-defendant Marcell Thomas's home with a search warrant. Hill asks "Was there something in there?" Booker responds that he does not know and Hill states that he is "on [his] way over there then." (Call 5569.)

  • Freeman tells Hill "Your little ass is hot boy." Hill responds, "I know." Freeman states, "You wanted to be the leader. Now you the leader . . . You wanted to be the boss. Now, you're the boss." Hill responds, "Get the fuck out of here, man." Freeman replies, "I got to tell the 18th District [Police Station] that I got to go through you to even come over there." Hill answers "Whatever dude." (Calls 7160 & 7161.)

---

[32] The government references call 5953 in its memorandum but it does not include a transcript of this call in its evidentiary submissions.

- Hill tells Freeman that he's "tired of sitting by the building." Freeman responds, "That's your thang, right?" Hill answers "Yea." (Call 7773.)

- Sanders asks Freeman to obtain a gun for him from Hill. (Call 7651.)

Hill made two arguments in response to the government's evidence. First, Hill argues that there was no Freeman DTO and, if there was, he was not part of it. Second, Hill argues that even assuming that the Freeman DTO existed and that Hill was a participant, his limited involvement in the conspiracy is not relevant to his count of conviction.

As to his first point, Hill argues that blue devil baggies were not a direct link to Freeman because people often sold their own drugs in blue devil baggies or baggies with other logos on them. Hill points to the testimony of Demarquis Williams who stated that those allowed to sell drugs at the 1230 Burling building were working for Freeman or were his friends. (Tr. 1822; 1830.) According to Williams, even "people that was serving Rondell Freeman still . . . had little stuff on the side" and "[s]ome of the people" selling in the building were competing against each other selling their own brand of drugs. (Tr. 1928.) Williams also testified that pink and blue baggies and other types of baggies were available at the corner store. (Tr. 1829.)

As to his second point, Hill argues that he had his own drug supplier independent of Freeman. Hill again points to the testimony of Demarquis Williams who stated that Hill had a drug business separate from that of Freeman, and that Hill identified his drugs by using ice cream cone baggies. (Tr. 1865.) Williams also testified that another drug supplier named Bone, who had no affiliation with Freeman, provided drugs to people who sold at the 1230 Burling building and that Bone was one of Hill's connections. (Tr. 1861.) Finally, Hill argues that the crack cocaine recovered as part of his count of conviction contained a cutting agent known as

procaine and Freeman's drugs did not, supporting his position that the drugs in question did not

originate with Freeman.  (Tr. 2547.)

## ANALYSIS

### I.    Consideration of Relevant Conduct

As an initial matter, defendants have all argued that the court should decline to consider

any conduct relating to the charged conspiracy when sentencing them for their counts of

conviction because the court vacated their convictions on Count 1 because the principal witness

for the government testified falsely and the government did not properly address this at trial. As

such, argue defendants, public policy concerns militate against the consideration of any evidence

tending to support the existence of the alleged conspiracy at sentencing because the government

stands to benefit from its misconduct at trial.  This appears to be an issue of first impression but,

having thoroughly considered the parties' arguments, the court concludes that it need not

exclude all conspiracy evidence to adequately address defendants' concerns.

The case law is clear that the court may consider evidence of uncharged and acquitted

conduct when determining a defendant's base offense level under § 1B1.3.  *See United States* v.

*Watts*, 519 U.S. 148, 157, 117 S. Ct. 633, 136 L. Ed. 2d 554 (1997) (per curiam) ("[A] jury's

verdict of acquittal does not prevent the sentencing court from considering conduct underlying

the acquitted charge, so long as that conduct has been proved by a preponderance of the

evidence."); *accord United States* v. *Waltower*, 643 F.3d 572, 577–78 (7th Cir. 2011); *see*

*Duarte*, 950 F.2d at 1263 (relevant conduct includes "drugs from any acts that were part of the

same course of conduct or common scheme or plan as the convicted offense, regardless of

whether the defendant was charged with or convicted of carrying out those acts") (internal

26

quotation marks omitted). The guidance of these cases is that consideration of evidence of the conspiracy is allowed.

A question remains concerning the nature of the conspiracy evidence that the court may consider. The Seventh Circuit has stated that a sentencing court "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information [it] may consider, or the source from which it may come." *United States* v. *Johnson*, 489 F.3d 794, 796–97 (7th Cir. 2007) (quoting *United States* v. *Hankton*, 432 F.3d 779, 790 (7th Cir. 2005)); *see United States* v. *Isom*, 635 F.3d 904, 907–08 (7th Cir. 2011) ("a sentencing judge is free to credit testimony that is totally uncorroborated, comes from an admitted liar, convicted felon, . . . large scale drug-dealing, paid government informant, or self-interested co-conspirator") (internal quotation marks omitted). One caveat to this rule is that the court may only consider evidence that has "sufficient indicia of reliability to support its probable accuracy." *Johnson*, 489 F.3d at 797 (quoting *United States* v. *Roche*, 415 F.3d 614, 618 (7th Cir. 2005); U.S.S.G. § 6A1.3(a)). These "'[i]ndicia of reliability' may come from, *inter alia*, the provision of facts and details, corroboration by or consistency with other evidence, or the opportunity for cross-examination." *United States* v. *Smith*, 674 F.3d 722, 732 (7th Cir. 2012) (internal citations omitted), *cert. denied*, 133 S. Ct. 546.

In advising the parties on how to prepare for the evidentiary hearings, the court stated that it would not consider the trial testimony of Senecca Williams in determining defendants' relevant conduct because it was his indisputably false testimony that led to the conclusion that the conspiracy convictions could not stand. *See* Dkt. #1102; *Freeman I*, 2009 WL 2748483, at *8. Although the Seventh Circuit has held that a sentencing court may properly credit certain

27

portions of a witness's testimony while discrediting other portions, *see, e.g., United States* v. *Hollins*, 498 F.3d 622, 630 (7th Cir. 2007); *United States* v. *Edwards*, 581 F.3d 604, 612 (7th Cir. 2009), it will not do so here. For the reasons set forth in *Freeman I*, the court has already determined that key portions of Williams's trial testimony were unreliable.[33] To the extent that some of his testimony could be salvaged for sentencing, there is no good way to sort it out. Senecca Williams's trial testimony would have been believable throughout had extrinsic evidence not established that in significant part it was false.[34] For this reason, and those set forth in *Freeman I*, the court finds that Senecca Williams's testimony is not credible and the court declines to consider it in determining the scope of defendants' relevant conduct under § 1B1.3. *See United States* v. *Olson*, 450 F.3d 655, 685 (7th Cir. 2006) ("The sentencing judge is best situated to determine the credibility of the witnesses . . . [and the appellate court] will not disturb the [district] court's finding on credibility unless it is without foundation.")[35]

The court will assess the reliability of the government's remaining witnesses in the discussion that follows.

## II.     Necessary Relation to the Offense of Conviction

To demonstrate that defendants should be sentenced based on the quantity of drugs sold by the Freeman DTO during the course of the alleged conspiracy, the government must first show that the uncharged conduct is part of a common scheme or plan or the same course of

---

[33] Defendants articulate additional reasons why Williams's testimony is unreliable in their briefs.

[34] Upon the suggestion of the government, the court will also forego consideration the out-of-court statements of co-conspirators Darnell Williams and Lonnie Mack.

[35] Throughout the evidentiary hearings the government maintained that it can meet its burden without relying on Senecca Williams's testimony.

conduct as the offense of conviction. *See* U.S.S.G. § 1B1.3(a)(2). "While these two formulations sound similar, they actually capture two distinct concepts." *Zehm*, 217 F.3d at 511. For two or more offenses to constitute a common scheme or plan, "they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3, Application Note 9(A). "Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of events." *Id.*, Application Note 9(B). To make this determination, "courts look[] to 'a strong relationship between the uncharged conduct and the convicted offense, focusing on whether the government has demonstrated a significant similarity, regularity, and temporal proximity.'" *United States* v. *Bacallao*, 149 F.3d 717, 719 (7th Cir. 1998) (quoting *Acosta*, 85 F.3d at 281); *see* U.S.S.G. § 1B1.3, Application Note 9(B). "When one of the factors, such as similarity, is relatively weak or absent, a stronger showing of regularity and temporal proximity will support a finding of relevant conduct." *Acosta*, 85 F.3d at 281; *see* U.S.S.G. § 1B1.3, Application Note 9(B).

### A.    Rondell Freeman

The government argues that Freeman was the leader of a drug trafficking organization and as such, the actions of his alleged co-conspirators are attributable to him. Rather than challenge the government's evidence using the factors set forth above, Freeman focuses on the alleged inadequacies of each individual piece of evidence. When considered as a whole,

29

however, the evidence demonstrates that it is more likely than not that Freeman was the leader of

a drug trafficking organization that procured, prepared, packaged, distributed and sold crack

cocaine, heroin, and marijuana in and around the Cabrini-Green housing complex and that his

organization was part of a common scheme or plan as well as the same course of conduct as his

counts of conviction.[36]  The evidence shows, for example, that Freeman's offense conduct was

substantially connected to his DTO by multiple factors such as common victims (drug users in

and around Cabrini-Green and members of the Cabrini-Green community), common actors

(Robert Freeman and Wilbourn), common purpose (to control the sale of drugs in and around

Cabrini-Green), and a similar *modus operandi* (the use of the Sheridan Shores condo to prepare

and package drugs and coordinate drug activities).  The government has also demonstrated a

strong relationship between Freeman's counts of conviction and the conspiracy including a

significant similarity, regularity, and temporal proximity between offenses.  The record

demonstrates that Freeman engaged in repeated and regular acts over the course of several years

to procure, prepare, package, and distribute primarily crack cocaine and heroin in and around

Cabrini-Green.  Freeman's counts of conviction are consistent with these activities and fall

squarely within the time period of the alleged conspiracy.  *See Acosta*, 85 F.3d at 281 ("Close

geographic and temporal proximity in activities that a defendant undertakes to advance his drug

trafficking enterprise are factors that indicate the activities are part of the same course of

conduct.").  Moreover, those who participated in Freeman's counts of conviction, *i.e.*, Robert

---

[36]  Counts 3 and 6 are of the type that require grouping under § 3D1.2(d) and are the counts to which
§ 1B1.3(a)(2) applies.  *See* U.S.S.G. § 2D1.1 (guideline provision for violations of 21 U.S.C. § 841);
§ 2K2.1 (guideline provision for 18 U.S.C. § 922(g)(1)).

Freeman and Wilbourn, were also charged as co-conspirators in the Freeman DTO and Wilbourn's role in Freeman's counts of conviction and the conspiracy was largely similar (*i.e.*, preparing, packaging, and distributing drugs). *See, e.g., United States* v. *Cedano-Rojas*, 999 F.3d 1175, 1180 (7th Cir. 1993) ("In considering the similarity of the conduct in question, a court must look to the identity of the participants and their roles in the events at issue[.]"). As such, the government has clearly shown that the Freeman DTO bears the necessary relation to Freeman's counts of conviction.

### B.    Brian Wilbourn

Wilbourn argues that his counts of conviction[37] were not part of a common scheme or plan or the same course of conduct as the Freeman DTO because he had his own drug business independent of Freeman. A review of the record, however, demonstrates that Wilbourn's counts of conviction have strong ties to the Freeman DTO. In Count 3, for example, Wilbourn can be seen preparing and packaging heroin at Freeman's condo. Counts 12 and 13 have similar ties to Freeman as Wilbourn is seen preparing and packaging drugs at Freeman's condo shortly before authorities stop him and recover 48.3 grams of crack cocaine and 23.4 grams of heroin. As the audio/video surveillance makes clear, Wilbourn and Freeman used a similar *modus operandi* to prepare and sell drugs, taking nearly identical steps to manufacture and package crack cocaine and heroin at the same condo and distributing these drugs to common sellers who then sold them to common victims in and around Cabrini-Green. Indeed, on one occasion Freeman can be heard

---

[37]  Counts 3, 7, 12, and 13 are of the type that require grouping under § 3D1.2(d) and are the counts to which § 1B1.3(a)(2) applies. *See* U.S.S.G. § 2D1.1 (guideline provision for violations of 21 U.S.C. § 841); § 2K2.1 (guideline provision for 18 U.S.C. § 922(g)(1)).

advising Wilbourn on how to properly cook cocaine into crack. This sharing of resources and knowledge supports the government's position that Wilbourn was working with Freeman. Although Wilbourn would have the court believe that each man worked independently of the other, the more likely conclusion is that he was involved in preparing, packaging, distributing, and selling drugs for Freeman. Wilbourn may have had his own drug business on the side, but this trade was not wholly independent of Freeman. Rather, the surveillance videos, recorded phone calls, trash pulls, drug seizures, and other record evidence persuade the court that the government has met its burden of showing that the Freeman DTO bears the necessary relation to Wilbourn's counts of conviction.

### C. Adam Sanders

Sanders does not argue that Count 32[38] was unrelated to the Freeman DTO and the court concludes that the government has presented sufficient evidence to clear this first evidentiary hurdle. The evidence related to Count 32 demonstrates that Sanders was arrested shortly after interacting with Wilbourn, who had just left Freeman's Sheridan Shores condo where the Freeman DTO was known to prepare and package drugs. The crack cocaine recovered from Sanders was packaged primarily in blue devil baggies, Freeman's brand of choice. The car in which Sanders was riding was registered to an alleged co-conspirator and was two blocks away from Cabrini-Green when it was stopped by police, supporting the inference that Sanders was on

---

[38] Count 32 is the only count of conviction that requires grouping under § 3D1.2(d) and it is the only count to which § 1B1.3(a)(2) applies. *See* U.S.S.G.§ 2D1.1 (guideline provision for violation of 21 U.S.C. § 841); § 1B1.3(a)(2), Application Note 3 ("Application of [§ 1B1.3(a)(2)] does not require the defendant, in fact, to have been convicted of multiple counts. . . . Subsection (a)(2) merely incorporates by reference the types of offenses set forth in § 3D1.2(d)."); *United States* v. *Johnson*, 347 F.3d 635, 638–39 (7th Cir. 2003).

his way to the complex to distribute and/or sell the drugs at the time of his arrest. Thus, the *modus operandi*, purpose and accomplices of Count 32 and the Freeman DTO were all similar. Finally, the temporal proximity is strong, with Sanders's being arrested at the height of the alleged conspiracy. These circumstances persuade the court that Sanders's count of conviction bears the necessary relation to the Freeman DTO.

### D.     Daniel Hill

The parties dispute whether Count 35[39] was part of a common scheme or plan or the same course of conduct as the Freeman DTO. The government argues that Count 35 and the conspiracy were part of a common scheme or plan because both shared common accomplices (*i.e.,* co-defendant Mack), and a common purpose of dealing drugs in and around the 1230 Burling building. It does not appear from the record, however, that this connection was substantial. At the evidentiary hearing, Hill presented evidence that Freeman was one of two suppliers servicing the 1230 Burling building and that not all of the people selling in the building were working for Freeman. Rather, as Demarquis Williams testified, some of these sellers were Freeman's friends, and even those who worked for Freeman often had their own drug business on the side. Consistent with this testimony, Hill argues that he had his own drug business, separate from that of Freeman, complete with his own supplier known as Bone. Hill may have shared a common purpose with the Freeman DTO to sell drugs in and around Cabrini-Green but,

---

[39] Count 35 is the only count of conviction that requires grouping under § 3D1.2(d) and it is the only count to which § 1B1.3(a)(2) applies. *See* U.S.S.G.§ 2D1.1 (guideline provision for violation of 21 U.S.C. § 841).

given that Hill had at least one other supplier, this fact alone fails to establish that Hill was working for Freeman when he sold 12 grams of crack cocaine to Mack on July 3, 2007.

Moreover, the government has failed to establish that the crack cocaine that Hill sold to Mack came from the Freeman DTO. Indeed, Agent Delicio testified that he did not know where Hill got the drugs and acknowledged that Freeman was incarcerated at the time of the transaction, and there was no evidence that the profits from the sale flowed back to the Freeman DTO. (*See* Tr. 2017–19.) Thus, it is unclear whether the drugs came from Bone or the Freeman DTO. It is also unclear whether common accomplices assisted Hill in procuring the drugs. At the evidentiary hearing, Hill presented evidence that the drugs recovered from Mack contained a cutting agent known as procaine, which was not present in drugs recovered from the Freeman DTO. The government countered that all of the crack cocaine and heroin seized in this case contained some type of cutting agent, although not necessarily procaine. Nevertheless, this evidence supports the inference that the drugs at issue were not supplied by the Freeman DTO.

The government next argues that Count 35 was part of the same course of conduct as the Freeman DTO because Hill's activities in the conspiracy were similar and regular enough to establish a strong relationship between the two. In support, the government set forth a comprehensive timeline of events that it argues demonstrates Hill's participation in the conspiracy over the course of seven years. The Seventh Circuit has cautioned, however, that "[w]here the gap in time [between offenses] is as long as . . . two years . . . '[the court] must be cautious and exacting in permitting such relatively stale dealings to be included in the same course of conduct as the offense of conviction.'" *United States* v. *Ruiz*, 178 F.3d 877, 882 (7th

Cir. 1999) (quoting *Cedano-Rojas*, 999 F.2d at 1180); *see United States* v. *Bullock*, 454 F.3d 637, 641 (7th Cir. 2006) (the court has "been wary of treating as relevant conduct drugs sales that took place [two years] back in time"); *United States* v. *Johnson*, 324 F.3d 875, 879 (7th Cir. 2003) ("While lapse of time between the two offenses is not in itself dispositive of the question of relevance, it does suggest the separate character of the two episodes.") (internal citation omitted)); *but see United States* v. *White*, 519 F.3d 342, 348 (7th Cir. 2008) (affirming that remote uncharged conduct was relevant where defendant's "drug trafficking was more or less consistent over the nine-year period in question").

Because Hill's count of conviction occurred in July 2007, the court will "cautious[ly]" consider evidence of similar dealings that occurred prior to July 2005.  When viewed with an exacting eye, this pre-July 2005 evidence falls short of establishing that Hill's count of conviction was part of the same course of conduct as the Freeman DTO.  First, the statements of co-conspirators Demarquis Williams and Ralph LaSalle relate to events as far back as 2000 and provide few, if any, details about the nature of Hill's involvement with Freeman.  Demarquis Williams testified that he saw Hill selling marijuana packaged in blue devil baggies in 2000 or 2001 or 2002.  His testimony provides no detail as to the specific dates, quantities or frequency of these alleged sales.[40]  LaSalle testified that Hill purchased drugs on Freeman's behalf "a couple of times" between 2000 and 2006, but there was no testimony about when, specifically,

---

[40]  Demarquis Williams's testimony regarding Hill's alleged 2004 drug sales suffers from the same shortcomings although this testimony is less persuasive because, according to Williams, Hill was selling drugs packaged in his signature ice cream cone baggies, not the blue devil baggies associated with Freeman.

these alleged purchases occurred or how much Hill purchased.[41]  In this regard, the government's evidence of prior drug dealings is considerably less detailed than statements considered by the court in other relevant conduct cases.  *See, e.g., United States* v. *Artley*, 489 F.3d 813, 817–818 (7th Cir. 2007) (witness told agents that he purchased approximately five kilograms of cocaine from the defendant between the fall of 1999 and January 2001; another witness told agents that she purchased an "8-ball" of cocaine from the defendant and his associates every week or two between October 2002 and May 2003); *White*, 519 F.3d at 348 (defendant admitted that he obtained one-half kilogram quantities of powder cocaine for resale twice a week between 1997 and 2002).  In addition, the type and/or quantity of drugs that Hill sold to Mack in July 2007 were different from those sales and/or purchases testified to by Williams and LaSalle.  Given the vague nature of this testimony, the significant time gap, and the dissimilarity of the drug types and/or quantities sold, this evidence fails to establish a strong relationship between Count 35 and the Freeman DTO.

The government's remaining pre-July 2005 evidence includes a recorded phone conversation where Hill tells Wilbourn that police kicked down the door to an apartment in the 1230 Burling building but recovered no drugs or money, and Demarquis Williams's testimony that Hill forcibly removed a man named Trap who was selling drugs in the 1230 Burling building without Freeman's permission.  This evidence supports the inference that Hill participated in the Freeman DTO, but it does not establish that Count 35 was part of the same scheme or plan as the conspiracy.

---

[41]  The government submitted evidence concerning the size and type of Freeman's typical purchases from LaSalle, but the record is sparse as to the specific purchases allegedly made by Hill.

The government's post-July 2005 evidence, which consists of one prior drug transaction, an audio/video recording, a drug ledger, and a number of phone calls recorded over a 10-day period in 2006, similarly falls short of meeting the government's burden. The most direct evidence of Hill's alleged participation in the Freeman DTO is the seizure of crack cocaine from him in the 1230 Burling building on December 19, 2005. These drugs, however, were packaged in gray baggies and it is unclear whether the drugs were supplied by Freeman.[42] Although this seizure and Hill's count of conviction both concern the possession of crack cocaine in or around the 1230 Burling building, the Seventh Circuit has emphasized that "[t]he mere fact that the defendant has engaged in other drug transactions is not sufficient to justify treating those transactions as 'relevant conduct' for sentencing purposes." *United States* v. *Crockett*, 82 F.3d 722, 730 (7th Cir. 1996). Rather, the government must demonstrate that the transactions "are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses," which it has failed to do here. U.S.S.G. § 1B1.3, Application Note 9(B).

Moreover, as with the testimony of Williams and LaSalle, the audio/video surveillance and recorded phone calls lack detail and do not suggest that the offense of conviction was more than an independent episode as opposed to part of the regular activity of the Freeman DTO. *Sykes*, 7 F.3d at 1337 ("Repeated, regular acts or offenses occurring at fixed and certain intervals (*e.g*., once a month or at a specific time each year) may suggest a plan linking the first offense to

---

[42] In general, the government maintained that blue devil bags were Freeman's brand. At the evidentiary hearing, the government argued that the evidence showed that Freeman's drugs were sold in packaging that included but was not limited to blue devil bags and that Freeman supplied drugs to Hill, which he in turn packaged in his own bags. These facts are not found in the evidence cited by the government.

the last, whereas sporadic acts over an extended time period generally . . . indicate independent acts that may lack the necessary link.").  Indeed, two of the phone calls (7160 & 7161) appear to be a joke between Freeman and Hill, and the April 1, 2006 audio/video surveillance (Video Tr. 4/1/06 at 16–17) undermines the government's position because Hill refuses to charge outsiders $50 for selling drugs on the first floor of the building.  Finally, the drug ledger could provide persuasive evidence of Hill's regular involvement with the Freeman DTO if it contained details concerning the scope of his participation, *i.e.*, the size or number of his drug sales for Freeman or money owed to Freeman.  *See United States* v. *Hillsman*, 141 F.3d 777, 782–83 (7th Cir. 1998) (district court did not clearly err in considering drug ledger in determining relevant conduct where ledger recorded cocaine customers, quantities sold to each customer, the price per kilogram, and the amount of money owed by each customer).  As relevant to Hill, however, the ledger contains only the initials "L.B." followed by arithmetic notations, which the government fails to explain in its filings.  (*See* Gov't Version 10/11/11 at 6–7.)  As such, the ledger fails to establish Hill's regular and ongoing participation in the Freeman DTO so as to demonstrate that Count 35 was part of a single episode, spree, or ongoing series of offenses.  *See, e.g., United States* v. *Cihler*, 28 F. Supp. 2d 539, 546–47 (E.D. Wis. 1998) (government failed to show by a preponderance of the evidence that amount of cocaine described in drug ledger constituted relevant conduct).

In determining the applicability of § 1B1.3, the Seventh Circuit has cautioned that because the rule "so favors the government, [the court] must be scrupulous to ensure that the government has adhered to [its] limits." *United States* v. *Beler*, 20 F.3d 1428, 1432 (7th Cir. 1994).  Having thoroughly reviewed the record and the briefs in this case, the court concludes

38

that the government has failed to show by a preponderance of the evidence that Hill's count of conviction was part of a common scheme or plan or the same course of conduct as the Freeman DTO. As such, the court will calculate Hill's drug quantity amount based solely on the 12 grams of crack cocaine included in Count 35.

## III.    Drug Quantity

If the court determines that the uncharged conduct bears the necessary relation to the count of conviction, it must next determine the scope of the criminal activity the defendant agreed to jointly undertake. Section 1B1.3 instructs that "jointly undertaken criminal activity" includes "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G. § 1B1.3(a)(1)(B). "After determining the scope of jointly undertaken criminal activity, 'the court must make a two-part determination of whether the conduct of others was *both* in furtherance of that joint criminal activity and reasonably foreseeable to the defendant in connection with the joint criminal activity.'" *Stadfeld*, 689 F.3d at 713 n.2 (emphasis in original) (quoting *United States* v. *Salem*, 597 F.3d 877, 886 (7th Cir. 2010) ("*Salem I*")).

### A.  Rondell Freeman

Based on the government's evidence, the court has little trouble concluding that Freeman agreed to jointly undertake the full scope of the alleged conspiracy and that the conduct of other participants was both reasonably foreseeable to Freeman and in furtherance of the conspiracy. Given the court's ruling that it may consider evidence related to the conspiracy in determining Freeman's relevant conduct,[43] his remaining objections largely pertain to the specific drug quantity advocated by the government under § 1B1.3.

Freeman argues that the government's witnesses are unreliable, biased, and/or provided vague, uncorroborated testimony concerning the nature and scope of his drug activities and that the government failed to demonstrate that the Freeman DTO was responsible for possessing and/or distributing 8.4 kilograms or more of cocaine base in the form of crack cocaine, 150 kilograms or more of cocaine, 30 kilograms or more of heroin, and a measurable quantity of marijuana.

To establish that Freeman is responsible for 8.4 kilograms or more of cocaine base in the form of crack cocaine, the government cites, *inter alia*, the testimony of Ralph LaSalle, Freeman's supplier.  (*See* Gov't Version 10/11/11 at 55 n.11.)[44]  LaSalle testified that he was first introduced to Freeman in early 2000 and began supplying him with cocaine thereafter.  (Tr.

---

[43]  *See* Analysis, Part I., *supra*.

[44]  The government also cites the out-of-court statements of Reginald Booker, one of Freeman's sellers, but, because the court concludes that LaSalle's testimony reliably establishes that the Freeman DTO was responsible for procuring 8.4 kilograms or more of cocaine base in the form of crack cocaine, the court need not consider Booker's statements.  (*See* Gov't Version 10/11/11 at 55 n.11.)

1045–51.)  LaSalle remained Freeman's supplier through April 2006 (approximately five years)

and, during this time, LaSalle sold Freeman between one and two-and-a-half kilograms of

cocaine every month or every two weeks.  (Tr. 1055–57.)  At first, LaSalle sold this amount to

Freeman every "[t]hree weeks to a month."  (Tr. 1056.)  Towards the end of their dealings,

however, Freeman purchased this amount "[a]bout every two weeks."  (*Id.*)  LaSalle's testimony

was subject to cross-examination and provides a credible estimate of the size and frequency of

Freeman's drug purchases from early 2000 through April 2006.  Conservatively, the amount of

cocaine Freeman purchased from LaSalle and then converted to crack amounts to 90 kilograms.[45]

Moreover, as evidenced by the surveillance videos and drug seizures, the Freeman DTO

primarily dealt in crack cocaine by manufacturing powder cocaine (presumably purchased from

LaSalle) into crack and selling it in and around Cabrini-Green.  The court therefore has little

trouble concluding that Freeman is responsible for at least 8.4 kilograms of cocaine base in the

form of crack cocaine under § 1B.1.3.

The reliability of the government's remaining estimates, however, is not as clear.  To

establish the quantity of drugs attributable to the conspiracy the government argues that

"Freeman's DTO sold crack, heroin and marijuana 24 hours/day, 7 days per week," but it cites

no evidence in its filing to support this conclusion.  (Gov't Version 10/11/11 at 55 n.11.)[46]

Additionally, the court is unclear as to how the government determined that the Freeman DTO

---

[45]  This calculation assumes that Freeman bought 1 kilogram of cocaine once a month for the first 2½
years and 2 kilograms of cocaine twice a month for the last 2½ years.

[46]  Senecca Williams testified to this fact.  (*See* Tr. 1328.)  Even if considered, however, Williams likely
meant that drugs were readily available.  It is unlikely that the defendants were present and selling on a
24-hour basis, 7 days a week.  LaSalle's testimony about periodic quantities of cocaine he supplied is a
better measure of drug amount.

sold 150 kilograms or more of powder cocaine. Most of the drugs seized in this case were crack cocaine or heroin, and the witness statements cited by the government in its version of events pertain to the sale of these two drugs, not powder cocaine. If the purchases from LaSalle are counted toward the powder cocaine drug quantity, it would be duplicative of the drug amount attributable to crack cocaine, which was the principal product of the DTO. Based on the evidence presented by the government, the court concludes that 150 kilograms is not a reliable estimate of the amount of powder cocaine distributed by the conspiracy. Moreover, the government has presented little if any evidence from which the court may make a reliable independent assessment. As such, the court finds that the amount of powder cocaine attributable to the conspiracy is zero.

The court comes to a similar conclusion as to the amount of marijuana distributed by the conspiracy. In the government's version of events, it states that "we know from the cooperating defendants that at any given time at least one seller was . . . selling marijuana." (Gov't Version 10/11/11 at 55 n.11.) The government fails to articulate, however, just *how much* marijuana was being sold, during what time period, and by which sellers. Again, the DTO's primary product was crack cocaine; to the extent that it also sold marijuana, the quantity and regularity of these sales is unclear from the record. As discussed below, however, (1) the court concludes that the drugs seized from Wilbourn on March 11, 2002, including 23.8 grams of marijuana, are part of his relevant conduct; and (2) Sanders admits that his relevant conduct includes the sale of 30 grams of marijuana. Based on these findings, therefore, the court concludes that the amount of marijuana attributable to the conspiracy is 53.8 grams.

Finally, a similar problem arises with the government's heroin estimate, which it puts at 30 kilograms or more over the course of the conspiracy. The government bases its estimate on the out-of-court statements of Booker, whose proffer was not provided to the court in preparation for the evidentiary hearings. (Gov't Version 10/11/11 at 56 n.11.) Contrary to Booker's estimate, however, the jury found that the amount of heroin attributable to the Freeman DTO was at least 100 grams but fewer than 1,000 grams, not 30 kilograms. (*See* Tr. 3154, 3156, 3158, 3159.) The government provides no explanation as to why Booker's out-of-court statements provide a more reliable estimate than the thoughtful assessment of the jury. Thus, based on the current record, the court concludes that Freeman is responsible for 8.4 kilograms or more of cocaine base in the form of crack cocaine, 100 grams of heroin, and 53.8 grams of marijuana under § 1B1.3.[47]

**B.    Brian Wilbourn**

Wilbourn makes three arguments to support his position that he did not work for Freeman and therefore did not agree jointly to undertake any criminal activity related to the alleged conspiracy. Wilbourn argues that (1) Demarquis Williams provided conflicting testimony regarding the scope of Wilbourn's involvement in the conspiracy; (2) surveillance and other evidence demonstrated that Wilbourn operated independently of Freeman; and (3) Wilbourn and Freeman worked together in a number of business ventures unrelated to drugs, which explains their frequent interactions.

---

[47] This ruling also applies to Wilbourn as discussed in Analysis, Part III.B., *infra*.

As an initial matter, the government need only demonstrate that Demarquis Williams's testimony is reliable for the court to consider it. *See, e.g., Cedano-Rojas*, 999 F.2d at 1180 ("The testimony of one witness, even one arguably biased against the defendant, is sufficient to support a finding of fact."); *United States* v. *Lueddeke*, 908 F.2d 230, 234 (7th Cir. 1990) ("[S]o long as the information which the sentencing judge considers has sufficient indicia of reliability to support its probable accuracy, the information may properly be taken into account in passing sentence.") (quoting *United States* v. *Miller*, 891 F.2d 1265, 1270 (7th Cir. 1989)). Having considered the evidence, the court concludes that any apparent inconsistencies in Williams's testimony are minimal. Williams testified, for example, that Wilbourn delivered drugs to him on behalf of Freeman on three or four occasions. At the same time, he acknowledged that Wilbourn was not Freeman's deliveryman and stated that Wilbourn did not work for Freeman. This apparent inconsistency can be explained by the fact that Wilbourn did not typically deliver drugs to Williams on Freeman's behalf but did so occasionally; a fact that Williams freely admitted on cross-examination.[48] Moreover, Williams may not have believed that Wilbourn worked *for* Freeman, but his testimony supports the inference that Wilbourn at least worked *with* Freeman.

---

[48] On cross-examination, the following colloquy took place:

Q:      Well, you would agree, Mr. Williams, that it wasn't a regular thing for Brian to deliver drugs
        from Rondell usually Rondell brought them himself, isn't that true?
A:      Yes.
***
Q:      Was Brian Wilbourn Rondell's deliveryman, as far as you know?
A:      No. But, you know, during that time he [Freeman] had him [Wilbourn] bring them [drugs] to me.

(Tr. 1841.)

The court concludes that Williams's testimony concerning the nature and scope of Wilbourn's involvment in the Freeman DTO is reliable.

Wilbourn next argues that the surveillance videos and other evidence demonstrate that he operated his own drug business independent of Freeman under the orange stripe brand. As such, argues Wilbourn, he did not agree to jointly undertake any criminal activity with Freeman. In determining the scope of the criminal activity that Wilbourn agreed to undertake, "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. § 1B1.3, Application Note 2. The following factors are relevant: (1) the existence of a single scheme; (2) similarities in *modus operandi*; (3) coordination of activities among schemers; (4) pooling of resources or proceeds; (5) knowledge of the details of the scheme; and (6) length and degree of the defendant's participation in the scheme. *Stadfeld*, 689 F.3d at 713; *United States* v. *Salem*, 657 F.3d 560, 564 (7th Cir. 2011) ("*Salem II*"). It is clear from the record that many of these factors favor the conclusion that Wilbourn agreed to jointly undertake the full scope of the Freeman DTO.

First, as previously discussed,[49] Wilbourn and Freeman shared the same *modus operandi* when it came to preparing, packaging, and distributing drugs. Although Wilbourn may have operated his own drug business under the orange stripe brand, he also made drug deliveries and pick-ups for Freeman and helped coordinate activities among co-conspirators. In addition, Wilbourn was caught with drugs that likely originated with Freeman. For example, on March 11, 2002, police seized 352 baggies of crack cocaine, heroin, and marijuana from Wilbourn

---

[49] *See* Analysis, Part II.B., *supra*.

labeled with the blue devil logo, Freeman's brand of choice.  Similarly, on November 13, 2006, police seized 77.6 grams of crack cocaine from Sanders, also labeled with the blue devil logo, shortly after observing Sanders interact with Wilbourn.  Unlike Hill, Wilbourn presented no evidence that these drugs or any others originated from Bone or some other source independent of Freeman.  Moreover, Wilbourn's close ties to Sanders, whom the court determines operated as a middleman for Freeman, *see* Analysis, Part III.C.i., *infra*, undermine Wilbourn's position that he operated wholly independent of Freeman.  *See also* Gov't Ex. IDOC 10/30/03; Tr. 2298–2303 (Wilbourn urges Sanders to "step up" and take his "slot"while Wilbourn is in custody.  There is no indication that the "slot" was at the head of Wilbourn's rather than Freeman's DTO).  The reasonable inference, therefore, is that they came from Freeman.

As demonstrated by the audio/video surveillance, Wilbourn was among the few individuals allowed to enter and operate out of Freeman's Sheridan Shores condo and he was intimately familiar with the inner workings of the DTO.  He knew that Freeman used the Sheridan Shores condo to prepare and package drugs; he knew those who assisted Freeman in this process; and he regularly witnessed Freeman and others preparing and packaging crack cocaine.  Wilbourn highlights the fact that on March 25, 2006 Freeman refused to allow Wilbourn to purchase drugs on credit, evidence that he argues demonstrates a nonconspiratorial buyer-seller relationship between the two.  *See United States* v. *Johnson*, 592 F.3d 749, 755 n.5 (7th Cir. 2010) ("[A] supplier extending credit to an individual buying a small quantity of drugs for personal consumption does not create a conspiracy."); *United States* v. *Colon*, 549 F.3d 565, 568–70 (7th Cir. 2008) (listing sales on credit as an example of evidence that could distinguish a conspiracy from a nonconspiratorial wholesale buyer-seller relationship).  The reason Freeman

46

refused to extend credit to Wilbourn, however, was because Wilbourn already owed Freeman money. *See* 3/25/06 Video Tr. 6 Clip 4 & 5 (Freeman tells Wilbourn "You still owe, man. You need to get right."). This conversation supports the inference that Freeman had previously extended credit to Wilbourn for the purchase of drugs and, as such, the two maintained more than just a simple buyer-seller relationship.

Finally, Wilbourn attempts to explain his illicit involvement with Freeman by arguing that the two worked together in a number of legitimate business ventures. Wilbourn's characterization of his relationship with Freeman as licit may account for some of his actions, but it does not outweigh the evidence that Wilbourn was closely associated with Freeman's drug activities as well. *See Anderson* v. *City of Bessemer City, N.C.*, 470 U.S. 564, 574, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *accord United States* v. *Hollins*, 498 F.3d 622, 631 (7th Cir. 2007). Although Wilbourn may have participated in more than one scheme to sell drugs in and around Cabrini-Green, the factors identified above (*i.e.*, similar *modus operandi*, coordination of activities among co-schemers, pooling of resources, knowledge of the details of the scheme, and length and degree of participation) favor the conclusion that Wilbourn agreed to jointly undertake the full scope of the Freeman DTO.

The court must next determine the drug amount that was both reasonably foreseeable to Wilbourn and in furtherance of the conspiracy. The government argues that Wilbourn was actively involved in the Freeman DTO for nearly 10 years from 1998 or 1999 through December 2007. At trial, Demarquis Williams testified that Wilbourn was "on the count" beginning in 1998 or 1999. The government was unable, however, to corroborate this testimony with

47

evidence of Wilbourn's actual drug dealings during 1998 or 1999.  Although Williams's testimony is reliable, it does not provide a basis to find facts concerning the nature and scope of Wilbourn's involvement in the conspiracy, particularly for a period so far back in time.  *See Bullock*, 454 F.3d at 641; *Johnson*, 324 F.3d at 879; *Ruiz*, 178 F.3d at 882; *Cedano-Rojas*, 999 F.2d at 1180.  Rather, Wilbourn's regular participation in the conspiracy does not become apparent until 2002 when, on March 11, 2002, police seize 352 blue devil baggies containing 38.6 grams of crack cocaine, .3 grams of heroin, and 23.8 grams of marijuana after seeing Wilbourn push them down a mail slot at the 1230 Burling building.  The drugs were of the type sold by the conspiracy, were recovered inside a building largely controlled by Freeman, and were labeled in Freeman's brand of choice.[50]

Although Wilbourn was in prison from April 23, 2002 through September 8, 2005, this time is not excluded in determining the drug amount associated with Wilbourn's relevant conduct.  The government's evidence of Wilbourn's involvement with the Freeman DTO during this period consists of two phone calls.  In the first phone call recorded by IDOC, Wilbourn urged Sanders to "step up" and take his "slot" while he is incarcerated.  (Gov't Ex. IDOC 10/30/03; Tr. 2298–2203.)  In the second call, Wilbourn discussed a police raid on an apartment in the 1230 Burling building with Hill.  (Gov't Ex. IDOC 1/13/04.)  There is also evidence that one month after Wilbourn was released from prison, he resumed working with Freeman.  On October 8, 2005, agents recovered a kilo wrapper and pyrex glass with cocaine residue from a

---

[50] Although Wilbourn was arrested with an individual who was not alleged to be part of the conspiracy, the court does not find this fact telling of whether Wilbourn was participating in the Freeman DTO at that time.

trash pull outside the Sheridan Shores condo after observing Wilbourn and Freeman exit the building with Senecca Williams, who threw these items in the trash. Surveillance videos, phone taps and/or drug seizures from 2005 through 2007 further demonstrate that Wilbourn was regularly and actively involved in the Freeman DTO during these years.

Thus, for the purpose of determining Wilbourn's base offense level under § 1B1.3, the court finds that he remained a part of the Freeman DTO while in prison, a finding best supported by his prompt return to the business once he was released. Given Wilbourn's intimate knowledge of the conspiracy, the court has little trouble concluding that all of the drugs produced, packaged, distributed, and sold by the Freeman DTO during this time were reasonably foreseeable to him. Wilbourn had first-hand knowledge of the types and quantity of drugs prepared and packaged by the Freeman DTO at the Sheridan Shores condo. He also knew that these drugs would be distributed and sold at Cabrini-Green and knew the people who were doing the distributing and selling or he was doing so himself. Wilbourn's unique position as an insider and his close relationship with Freeman makes him particularly culpable in this regard. Thus, the court finds that Wilbourn is accountable under § 1B1.3 for all of the drugs procured and sold by the Freeman DTO from March 11, 2002 through May 24, 2007, the date on which agents recovered blue devil and orange stripe baggies from the Sheridan Shores condo.[51]

_____

[51] Wilbourn also challenges the government's reliance on his prior felony drug conviction to enhance his sentence for Count 13 under 21 U.S.C. § 841(b)(1)(B). He argues that (1) the government's notice of enhancement was invalid because it did not include a copy of the judgment of conviction; (2) the conviction upon which the government relies was obtained in violation of Wilbourn's right to counsel under the Sixth Amendment and *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); and (3) the use of such an

(continued...)

### C.    Adam Sanders

Sanders makes three arguments in favor of a lower base offense level under § 1B1.3.  He argues that 1) testimony presented by the government was unreliable, and recorded phone conversations do not establish liability for the full amount of drugs attributable to the conspiracy; (2) he was not a high-level manager but, rather, a common delivery boy and seller whom Freeman distrusted; and (3) the government misapplies § 1B1.3 to the facts of his case.

### i.    Scope of the Jointly Undertaken Criminal Activity

---

(...continued)

enhancement against a defendant who was otherwise inclined to plead guilty violates public policy. Wilbourn neither cites no legal authority nor develops a legal theory for urging a change in statutory interpretation. *See United States* v. *Andreas*, 150 F.3d 766, 769 (7th Cir. 1998) ("perfunctory and undeveloped arguments (even constitutional ones) are waived"). That aside, the arguments must fail. As to the adequacy of the notice, 21 U.S.C. § 851 does not require the government to attach a copy of the judgment of conviction, and there is no ambiguity here as to which conviction the government relied on.  As to the validity of his prior conviction, § 851(e) imposes a five-year statute of limitations on challenges to qualifying offenses.  *See* 21 U.S.C. § 851(e) ("No person who stands convicted of an offense under this part may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction.").  Wilbourn was convicted on September 10, 2002, in the Circuit Court of Cook County, of possession of a controlled substance in violation of 720 ILL. COMP. STAT. 570/402(c) (*See* Dkt. #182; Supp. PSR at 8 (Case No. 01 CR 65201).)  This conviction became final on October 8, 2002.  *Id.*  On April 22, 2008, the government filed its information pursuant to § 851.  (Dkt. #182.)  Thus, the time for challenging this conviction has passed.  *See United States* v. *Arango-Montoya*, 61 F.3d 1331, 1337 (7th Cir. 1995) ("A defendant who fears the possible future use of his conviction against him had better challenge the validity of the conviction within five years.").  Finally, as to Wilbourn's public policy argument, the legislature has chosen to vest in the United States Attorney the discretion to seek an enhanced sentence by serving the § 851 information, whether or not the defendant has expressed willingness to plead guilty.  Although the wisdom of that decision in this instance may be questionable in light of the then-planned (and since completed) destruction of the very buildings and dispersal of the community in which the Freeman DTO operated, the United States Attorney's authority is statutory and, as such, can hardly be against public policy.

The government argues that the scope of Sanders's jointly undertaken criminal activity is equal to the full scope of the Freeman DTO and, as such, Sanders is accountable for the entire drug amount attributed to the conspiracy. In determining the scope of the criminal activity that Sanders agreed to jointly undertake, the factors outlined above are relevant (*i.e.*, single scheme, similar *modus operandi*, coordination of activities among co-schemers, pooling resources or proceeds, knowledge of details of the scheme, and length and degree of participation). A review of the record demonstrates that some of these factors favor the conclusion that Sanders agreed to jointly undertake the full scope of the Freeman DTO.

First, Sanders does not deny that he was part of a scheme to sell drugs in and around Cabrini-Green. Testimony at trial established that Freeman largely controlled the drug trade in this area and that those who sold drugs at the 1230 Burling building were friends with Freeman or worked for him. (*See* Tr. 1822; 1830.) Unlike Hill, Sanders does not argue that he had a supplier other than Freeman, and Demarquis Williams testified that when he saw Sanders selling drugs they were often packaged in blue devil baggies. Drugs recovered from Sanders were also packaged with the blue devil logo.[52] Moreover, as evidenced by the phone calls recorded between October 20 and 28, 2006, Sanders was involved in coordinating the activities of sellers and funneling proceeds from street-level sales back to Freeman. He certainly had knowledge of the type and quantity of drugs that these individuals sold for Freeman, and the evidence demonstrates that Sanders was a longstanding participant in Freeman's scheme.

---

[52] These drug seizures occurred on November 13, 2006 and January 24, 2007.

At the same time, other facts persuade the court that Sanders did not agree to participate at the highest levels of the conspiracy. First, Sanders produced evidence that Freeman did not hold him in high esteem. Demarquis Williams testified that Freeman did not trust Sanders and considered him a "fuck-up." (Tr. 1904; *see also* Call 5503: Freeman chides Sanders for falling asleep instead of running envelopes.) In addition, the content and tone of some of the recorded conversations tends to support Sanders's position that Freeman did not view him as an equal and did not trust him to complete even menial tasks. (*See, e.g.,* Call 6226: Freeman tells Sanders, "Tell them shortys [to be] on point in the morning," and "You need to get my money from Little B in the morning."; Call 5700: Freeman tells Sanders to "stay your ass out there [by the building]."; *but see* Call 6287, Freeman asks Sanders "[s]o, what are we going to do" about the collection of certain narcotics proceeds). Moreover, Sanders does not appear to have been involved in preparing and packaging drugs at the Sheridan Shores condo, nor did Freeman send Sanders to purchase drugs from LaSalle on his behalf. Finally, Sanders's long arrest record reflects that he was fairly inept at the drug business and prone to getting caught; not a desirable characteristic of an alleged manager of a substantial, long-running drug organization.[53] Taken together, these facts persuade the court that Sanders did not agree to jointly undertake the full scope of the conspiracy. Rather, the scope of his involvement was limited to supervising certain

---

[53] When he was evaluated in 2009, Sanders's estimated IQ was 74, which is in the borderline mentally retarded range. (*See* Dkt. #1008 at 3 & Ex. 1 at 8.)

sellers[54] and distributing drugs to and collecting proceeds from these sellers. In other words, Sanders was not a high level manager, but rather a middleman in the Freeman DTO.

### ii. Reasonably Foreseeable and in Furtherance of the Jointly Undertaken Criminal Activity

Having determined the scope of the criminal activity that Sanders agreed to jointly undertake, the court must next determine the drug quantity that was both reasonably foreseeable to him and undertaken in furtherance of that activity. To actuate this amount, the court must determine the length of Sanders's involvement in the conspiracy and the amount of drugs attributable to him.

### 1. Length of Sanders's Participation in the Freeman DTO

Sanders admits that five prior arrests are relevant to determining his drug quantity amount. The first arrest occurred on June 29, 2001 and the last arrest occurred on January 24, 2007. The timing of these arrests supports the conclusion that Sanders was an active member of the conspiracy between these dates. Although Sanders was in and out of custody during this time,[55] the evidence supports the inference that, upon his release, he promptly resumed his role in the conspiracy. For example, Sanders was incarcerated from November 29, 2005 through

---

[54] The record does not support a finding that Sanders was responsible for supervising all of Freeman's sellers. Rather, Freeman and Sanders can be heard discussing only certain individuals or "squads." Nor has the government demonstrated that Sanders knew the identity of all the sellers working for Freeman, so that their conduct was reasonably foreseeable to him. From the record, therefore, the court concludes that Sanders was responsible for supervising some, but not all, of Freeman's sellers.

[55] Sanders states that he was in custody from February 8, 2002 through October 10, 2002; February 5, 2003 through February 27, 2003; April 28, 2003 through September 22, 2003; January 13, 2005 through August 3, 2005; November 29, 2005 through October 6, 2006; and January 25, 2007 through August 31, 2007. (Dkt. #1007 at 8–9.)

October 6, 2006, yet less than one month after his release the government recorded multiple phone conversations between him and Freeman discussing the sale of drugs and collection of drug profits. (*See* Calls recorded from October 20, 2006 through October 28, 2006.) Indeed, during one of his incarcerations, Sanders is recorded discussing his intent to resume working for Freeman upon his release. (*See* Gov't Ex. IDOC 1/30/06 (stating that to get money to rent an apartment he would "have to do what I gotta do . . . Blue Devs").) Thus, the court finds that Sanders participated in the conspiracy from June 29, 2001 through January 24, 2007 and remained a member of the Freeman DTO while in prison.[56]

---

[56]  The same issue arises as to both Wilbourn and Sanders; namely, whether the activities of the Freeman DTO were reasonably foreseeable to each man while he was incarcerated. The government essentially asks the court to impose the type of conspiratorial liability outlined in *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). Under *Pinkerton*, "co-conspirators are liable for overt acts of every other conspirator done in furtherance of the conspiracy." *United States* v. *Gutierrez*, 978 F.2d 1463, 1467 (7th Cir. 1992). Thus, the *Pinkerton* rule allows the court to "aggregate all the quantities of drugs involved in an entire, basic scheme of multiple defendants" up until the time that the defendant withdraws from the conspiracy. *United States* v. *Taylor*, 72 F.3d 533, 547–48 (7th Cir. 1995) (citations and internal quotations omitted); *see Smith* v. *United States*, 133 S. Ct. 714, 719, 184 L. Ed. 2d 570 (2013) (withdrawal terminates the defendant's liability for the post withdrawal acts of co-conspirators). The Seventh Circuit has cautioned, however, that "[c]onspiracy liability, as defined in *Pinkerton* . . . is generally much broader than jointly undertaken criminal activity under § 1B1.3." *United States* v. *Soto-Piedra*, 525 F.3d 527, 531 (7th Cir. 2008); *accord United States* v. *Fox*, 548 F.3d 523, 532 (7th Cir. 2008); *see also* U.S.S.G. § 1B1.3, Application Note 2 ("the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not the same for every participant").

Evidence that Wilbourn and Sanders actively participated in the Freeman DTO while each man was in prison is admittedly thin; the government relies on three phone conversations recorded over the approximately 3½ years that each man was in custody. (*See* Gov't Ex. IDOC 10/30/03; Gov't Ex. IDOC 1/13/04; Gov't Ex. IDOC 1/30/06.) These phone calls demonstrate that Wilbourn and Sanders were aware of the continuing activity of the Freeman DTO and did not withdraw from the conspiracy, but there is minimal evidence demonstrating that each man remained actively involved in the DTO's activities during this time. Nevertheless, given Wilbourn's and Sanders's knowledge of the conspiracy and the fact that each promptly returned to working for the DTO upon his release, the court concludes that the activities of the DTO were reasonably foreseeable to both Wilbourn and Sanders while they were in

(continued...)

### 2.    Drug Amount Personally Attributable to Sanders

Sanders admits that he is personally responsible for distributing 97.3 grams of crack cocaine, 19.4 grams of heroin, and 30 grams of marijuana during the course of the conspiracy. The court also finds that Sanders is personally responsible for the drug proceeds that he collected from sellers between October 20 through 28, 2006. These proceeds are discussed at length in the recorded phone calls. As argued by Sanders, the court may extrapolate a drug quantity based on the amount of money discussed in these calls. This extrapolation will require further submissions from the parties, but the court holds that Sanders is personally responsible for these drug amounts.[57] *See* U.S.S.G. § 2D1.1, Application Note 5 (allowing the court "approximate the quantity of the controlled substance" under § 1B1.3(a)(2)).

### 3.    Drug Amount Attributable to Sanders Based on Undetected Conduct

The court must next determine the drug amount attributable to Sanders for the jointly undertaken criminal activity for which he was never caught. To accomplish this task, the court must extrapolate the drug amount related to Sanders's middleman activities during those times when he was involved in the conspiracy but for which no audio recording or drug arrest exists. Fortunately, the recorded phone calls between Freeman and Sanders provide a snapshot of Sanders's regular activities. These conversations demonstrate that between October 20 and 28,

---

(...continued)
prison.

[57] It is not entirely clear from the phone calls which drug is being discussed. Given that the Freeman DTO primarily dealt in crack cocaine, as did Sanders, the parties should assume that the two men are discussing this drug.

2006, Sanders was responsible for supervising sales and collecting drug proceeds from certain individuals (*i.e.*, Little B (Hill), Duke (Deshawn Simmons), and "Bob's squad" (Booker)) at Freeman's behest. As previously discussed, the court can extrapolate a drug amount based on the money discussed in these calls. This is the drug amount personally attributable to Sanders during these eight days. The parties may then use this number to provide a reasonable estimate (reflected in a drug amount) of Sanders's supervising activities for those days when Sanders was involved in the conspiracy but for which no audio recording exists.

Sanders's prior drug arrests provide a similar snapshot of his drug distribution activities, however, these arrests only represent the times that Sanders was actually caught distributing drugs in furtherance of the conspiracy; the number of times that he did the same without detection is unclear. The court has surveyed the scientific literature for any empirical studies of how to measure drug quantity based on frequency of arrests, an unsurprising vain search. Lacking any principled yardstick, the court will rely on the parties to propose a reliable estimate, based on Sanders's previous drug arrests or any other available criteria, of the amount of drugs that he distributed during the course of the conspiracy. This is the amount that he distributed to Freeman's sellers without being caught by law enforcement. This amount was both reasonably foreseeable to Sanders and distributed in furtherance of his jointly undertaken criminal activity.

To summarize, the court concludes that Sanders was a middleman in the Freeman DTO from June 29, 2001 through January 24, 2007. He admits that he is personally responsible for distributing 97.3 grams of crack cocaine, 19.4 grams of heroin, and 30 grams of marijuana during the course of the conspiracy. Using these drug amounts, the parties are instructed to

provide a reliable estimate of the drugs that Sanders distributed during the course of the conspiracy without detection. As for Sanders's supervising role in the collection of drug proceeds, the court will rely on the parties to provide a reliable estimate of the collected proceeds (reflected in a drug amount) based on the phone calls recorded between October 20 through 28, 2006.

## CONCLUSION AND ORDER

For the foregoing reasons, the court holds that U.S.S.G. § 1B1.3(a)(2) applies to defendants Rondell Freeman, Brian Wilbourn and Adam Sanders to increase their base offense level for their offenses of conviction as stated herein. As to defendant Daniel Hill, the court holds that the government has failed to meet its burden of demonstrating that his offense of conviction was part of a common scheme or plan or the same course of conduct as the alleged conspiracy. A status hearing is set for May 29, 2013 at 9:15 to address the remaining outstanding issues and to set sentencing dates for each defendant.


Date: May 13, 2013                    Enter: _____

                                      Judge Joan Humphrey Lefkow
                                      UNITED STATES DISTRICT COURT